Rodney A. GIBBONS, as Personal Representative of the Estate of Steven Mark Gibbons, Deceased, Plaintiff and Appellant,

v.

Brenda K. BLAIR, a/k/a Brenda K. Gibbons, Defendant and Appellee.

Civ. No. 10951.

Supreme Court of North Dakota.

Oct. 28, 1985.

Nelson, Kalash & Molenaar, Grand Forks, for plaintiff and appellant; argued by Steven J. Remark; appearance by Dwight F. Kalash.

Richard W. Olson (argued), Grand Forks, for defendant and appellee; appearance by Gerald Paulson.

MESCHKE, Justice.

We consider whether a father may sue his deceased son's widow to annul the marriage for fraud. We hold that he may not.

Rodney A. Gibbons sued Brenda K. Blair Gibbons seeking the annulment of the marriage of his late son, Steven Gibbons, and Brenda, asserting that Brenda had fraudulently induced Steven to marry her by promising to make Steven the "daddy" of her baby. Brenda's answer denied fraud and asserted that the father lacked standing to bring the action. The district court granted Brenda's motion for summary judgment dismissing the complaint, holding that a marriage is not subject to annulment for fraud after the death of one of the spouses and that the father did not have standing to bring the action.

The marriage was brief and tragic. Steven and Brenda had dated "on and off" since October, 1981. Brenda wrote Steven on May 23, 1984, while he was stationed in California in military service, and asked him to marry her if he did not mind becoming a "daddy" to the child which she expected to bear shortly. Steven knew that he was not the father.

Brenda gave birth June 12, 1984, naming another man as father. Steven returned June 15 on military leave. They were married June 27 and lived together at her father's home until July 25 when he left for assignment in Germany.

In the week following their marriage, Brenda and Steven sought legal aid advice about Steven's adoption of the child, but were advised to delay proceedings until Steven's return from Germany. Once in Germany, Steven made some attempts to obtain passports so that Brenda and the baby could join him. On August 7, Brenda placed her child for adoption with a family service agency which she had contacted before the marriage. Brenda claims that Steven promised to send $600 per month for her and the child but in fact had provided only $75. Steven's father accuses Brenda of being with other men between July 25 and August 7. When Steven's parents informed him August 9 that Brenda had placed the child for adoption, he unsuccessfully requested emergency military leave, but did return August 18 on a one week leave at his own expense.

Steven's father claims that Steven and Brenda discussed annulment or divorce, and that Steven sought legal aid advice about annulment or divorce but was told that they could not assist him because he had been there earlier with Brenda seeking an adoption.

On August 25, as Steven's parents prepared to take him to the airport for his plane to Germany, he shot and killed himself in the yard at his parent's home.

At stake is the $35,000 proceeds of Steven's military group life insurance policy which the insurer deposited in court. The

designation of beneficiary, dated August 3, 1984, said simply "by law." The summary judgment ordered the proceeds paid to Brenda.

The nearly universal majority rule, articulated in decisions from many jurisdictions and summarized in Annot., "Right to attack validity of marriage after death of party thereto," 47 A.L.R.2d 1393, 1407 (1956), holds that marriages which are voidable for fraud can be annulled only during the lifetime of the parties to the marriage. The underlying rationale seems to be that the relationship of marriage is so intimate and personal that third persons, no matter how closely related, should not be allowed to assemble evidence to affect it, at least on grounds of fraud, in the absence of the marriage partner directly affected by the possible fraud.

Nevertheless, the father urges us to accept his argument that an action for annulment based upon extreme fraud does survive the death of the injured spouse. After careful consideration of the cases cited by the father, we conclude that his reliance upon them is misplaced.

The Florida Supreme Court in *Savage v. Olson*, 151 Fla. 241, 9 So.2d 363 (1942), did uphold the annulment of a marriage after the death of the innocent spouse, but the case appears to turn upon both lack of competency and extreme fraud. The decision is virtually anomalous in the course of case decisions on the subject of fraud.

In *In Re Haney's Will*, 14 A.D.2d 121, 217 N.Y.S.2d 324 (1961), New York's intermediate appellate court construed § 1139 of the New York Civil Practice Act to allow the continuance of a *pending* action for annulment on the ground of fraud, where a New York statute specifically provided that a relative could maintain a cause of action for annulment after the defrauded spouse's death. The court noted: "The statute thus evidences a clear legislative policy in favor of the survival of the cause of action, which overrides the common-law rule to the contrary." 217 N.Y.S.2d at 327. Section 140(e) of the New York Domestic Relations Law (McKinney 1977) continues this policy.

In *In Re Romano's Estate*, 40 Wash.2d 796, 246 P.2d 501 (1952), the Washington Supreme Court, after analyzing and evaluating decisions that upheld certain collateral attacks upon a marriage after the death of one of the spouses, concluded that the sounder view and the general weight of authority prohibited collateral attacks upon marriages voidable for fraud after the death of one of the spouses.

Thus the limited decisional authorities cited by the father for his argument, that an action for annulment based upon extreme fraud should survive the death of the injured party, are neither supportive nor persuasive.

The father contends that the North Dakota statute permits someone other than the defrauded spouse to bring the annulment action after the spouse's death. North Dakota Century Code § 14-04-01 sets forth the grounds for annulling a marriage. Among these are:

"3. That either party was of unsound mind, unless such party, after coming to reason, freely cohabited with the other as husband or wife.

"4. That the consent of either party was obtained by fraud, unless such party afterwards, with full knowledge of the facts constituting the fraud, freely cohabited with the other as husband or wife."

The time limitations for bringing actions to annul are specified in N.D.C.C. § 14-04-02:

"An action to obtain a decree of nullity of marriage for causes mentioned in section 14-04-01 must be commenced within the periods and by the parties as follows:

\*     \*     \*     \*     \*     \*

"3. For causes mentioned in subsection 3, by the party injured, *or a relative or guardian of the party of unsound mind, at any time before the death of either party.*

"4. For causes mentioned in subsection 4, by the party injured, within four years after the discovery of the facts constituting the fraud." (emphasis supplied.)

According to the father, when the consent of either party to a marriage was obtained by fraud, the only conditions for seeking an annulment are that the action be brought by a party who was innocently injured by the fraud and that the action be brought within four years of the discovery of the fraud. The father asserts that he and Steven's mother are injured parties under § 14–04–02(4) because Brenda's fraud prevented them from inheriting any of Steven's estate or life insurance proceeds. The cause of action can only survive the death of the defrauded spouse if the term "party injured" in subsection 4 of § 14–04–02 is construed to mean someone other than the person who was fraudulently induced to marry.

While subsection 4, standing alone, might be so interpreted, we must consider the entire section as a whole. *Puklich & Swift, P.C. v. State Tax Commissioner,* 359 N.W.2d 846, 849 (N.D.1984). When we do so, the father's argument fails.

Subsection 3 of N.D.C.C. § 14–04–01 deals with marriages that can be annulled when one of the parties was of unsound mind. The corresponding subsection of N.D.C.C. § 14–04–02 specifically allows relatives or guardians of the spouse of unsound mind to sue on behalf of the party unable to sue on his own behalf, but the action must be brought before the death of either party to the marriage. "Party" here clearly means party to the marriage.

Our legislature has specifically provided for a relative or guardian to bring an action on behalf of a spouse of unsound mind, as long as neither party has died. Had the legislature intended to similarly allow someone other than a party to the marriage to bring an action on behalf of a spouse injured by fraud, it could have as easily specified that.

The majority rule is soundly based on the public policy that regards the marriage contract as so uniquely personal that any action to annul or dissolve it cannot be commenced after the death of either of the parties to the marriage unless the validity of the marriage is challenged on a ground that made the marriage absolutely void rather than voidable. Applying the majority rule and rationale to the facts of this case, we hold that an action to annul a marriage on the ground of fraud can only be brought by the defrauded spouse while both parties to the marriage are living.

The summary judgment of dismissal is affirmed.

ERICKSTAD, C.J., and LEVINE, VANDE WALLE and GIERKE, JJ., concur.